## Sholes v. The State.

1. PUBLICATION OF REVISED STATUTES—CONTRACT WITH STATE—ACCORD AND SATISFACTION.—S. was selected under section 2, chapter 154, Revised Statutes 1849, to publish the Revised Statutes, and he delivered to the governor, under his contract, 4,000 copies, *worth, in fact,* $2.28 *per copy;* in all, $9,120. Under the provisions of section 3, chapter 154, Revised Statutes 1849, the governor had subscribed in the executive records of his office for said copies at $1.53 each, amounting for the 4,000 copies to $6,120, which was appropriated in full payment as the state claimed, and in part payment as the plaintiff claimed, for the books; the act (Laws 1850, ch. 143,) expressing that that sum was appropriated "in full for 4,000 copies of the Revised Statutes of the state of Wisconsin, subscribed for and received by the governor of the state," and this sum the plaintiff afterwards received from the

state treasurer. *Held*, 1. That the provision of the constitution prohibiting the taking of private property for public use, without due compensation, had reference only to cases of the exercise of the right of eminent domain, or superior ownership vested in the state, and had no application to contracts between it and individuals so as to bind it to pay as on a *quantum meruit*, or *quantum valebat*, though the contract price was much less. 2. By the act in question, the governor was made the agent of both parties to subscribe for the copies, and fix the price within his discretion, not exceeding a certain amount, and to accept the books when offered according to the contract, and the plaintiff took the contract at the risk of the action of the executive. 3. The appropriation, which, by its terms, was to be *in full* for the books, having been received by the plaintiff, there having been controversy about his demand, estops the plaintiff from setting up any further claim on account of his demand; neither fraud, accident or mistake in matter of fact having intervened to his prejudice. *Calkins v. State*, 13 Wis. 389.

2. PUBLIC PRINTING—CONSTITUTION.—The provision of section 21, article 7, of the constitution, making it the duty of the legislature "to provide, by law, for the speedy *publication* of all statute laws, and such judicial decisions made within the state as it may deem expedient," is not dependent upon or necessarily connected with the provisions of section 25, article 4, requiring all *printing*, authorized or required for the legislature or state, to be let by contract to the lowest bidder. The acts for the publication of the Revised Statutes (ch. 154, R. S. 1849) is not in conflict with this provision of the constitution.

3. STATE CONTRACT WITH.—A contract between an individual and the state is to be construed, and the liabilities of the parties under it are to be determined by the same rules as in contracts between individuals.

*(2 Chand. 182.)*

ACTION in the Supreme Court against the State.

This was an action instituted by the plaintiff under the provisions of the statute, authorizing actions at law against the state by individuals, founded upon the petition of the plaintiff filed at the present term of this court, alleging that by an act, passed by the legislature of the state of Wisconsin, approved March fifteenth, in the year one thousand eight hundred and forty-nine, entitled " of the publication of the revised statutes," it was enacted that the revised statutes of this state should be published in one volume, large octavo, on new small pica type, and on paper of good book quality, bound

in calf in the modern style of law book binding ; and that for the purpose of publication, the copyright of said statutes was secured for the space of two years to the commissioners to revise the laws or some suitable person to be selected by them ; that the commissioners, or the person so selected, should, within twenty days after the passage of said act, execute to the governor of this state a bond in the penal sum of $10,000, with two or more sufficient sureties to be approved by said governor, conditioned for the faithful publication of the work and its delivery to the state agreeably to the provisions of said act; that the governor of the state was authorized and required, in the name of the state of Wisconsin, to subscribe for and take, when printed, bound and completed, as was therein provided, four thousand copies, to be desposited in the state library for the use of the state, at a sum not exceeding one dollar and seventy-five cents per volume, unless the volume should contain more than seven hundred pages, in which case there should be allowed twenty-five cents for every one hundred pages of excess over the above mentioned number of seven hundred pages, and proportionately for a less number of excess of pages ; that the contractor was required to publish at least two thousand copies in addition to the number contracted for by the state, and in the sale of them was restricted in price to a sum not exceeding four dollars per copy ; that the said revised statutes should be printed, bound, completed and delivered at the seat of government of the state on or before the first day of December then next ; that the governor was authorized to receive and accept of the said statutes so as to be delivered, if he should be of the opinion that the work had been done according to the contract and the requirements of said act ; that should he accept and receive the same, he was authorized and directed to deliver to said contractor a receipt for the same, and to cancel his bonds; that the contractor, in the publication of the work, should be subject in its arrangement, side

notes, index and general character, to the person or persons who might be appointed by the legislature to superintend the same ; and by an act entitled, " of the superintendance of the publication of the revised statutes," it was made the duty of the secretary of state to cause to be copied the several chapters composing the revised statutes, and all other laws which were required to be published therewith, and to furnish them to the said commissioners within thirty days of the close of the then session of the legislature, and he was authorized to employ such clerk or clerks as might be necessary to accomplish the work within the time specified ; and it was provided that said expense for copying should not exceed, in the aggregate, more than $250, and that the same should be paid by the person or persons having the copyright ; that agreeably to the provisions of said act, the commissioners to revise the laws did, on the twentieth day of March, in the year one thousand eight hundred and forty-nine, select and appoint the petitioner to publish and deliver the said revised statutes, according to the provisions of said act ; that on the twenty-fourth day of March, in the year last aforesaid, this petitioner did execute the bond required by said act, which bond was duly approved by the governor of the state and placed on file ; that the petitioner then proceeded to the publication of said revised statutes with a direct reference to the maximum price mentioned in said act, to wit : the sum of one dollar and seventy-five cents per volume, for seven hundred pages, and twenty-five cents additional per volume for every hundred pages of excess over said number of seven hundred, and proportionately for a less number of pages of excess ; that the petitioner submitted the arrangement of the work, its side notes, index and general character, to the direction of *Charles M. Baker*, who was duly appointed, by an act of the legislature of the state, entitled " of the superintendence of the publication of the revised statutes," to superintend the publication of said

revised statutes, and that he paid the said *Charles M. Baker* the sum of $600 for superintending the publication of said statutes, as was required to do by the act last above referred to, and paid the secretary of state $250 for copying said statutes, as he was required to do by said act; that this petitioner published six thousand copies of said revised statutes, each volume containing nine hundred and twelve pages, large octavo, printed on new small pica type, on paper of good book quality, bound in calf, and in the modern style of law book binding; that on the first day of December, in the year one thousand eight hundred and forty-nine, he delivered to *Nelson Dewey*, governor of the state, at Madison, the seat of government of said state, four thousand copies of the said revised statutes, printed, bound and completed as aforesaid, which copies the said governor did then and there accept of this petitioner, and did cancel this petitioner's bond so executed as aforesaid, and deliver to this petitioner a receipt for said statutes, which receipt is in the words and figures following, to wit: " Received of *C. Latham Sholes* four thousand copies of the revised statutes of the state of Wisconsin, published by him, in boxes unopened, which he has guaranteed to contain the requisite number of 4,000 volumes, and to be of the quality of the sample delivered. (Signed) NELSON DEWEY, Governor of Wisconsin; " that the said two thousand copies of said statutes, required to be published by said act, additional to the four thousand copies contracted for by the state, have been so published as required by said act, and that in the sale of the said two thousand additional copies, this petitioner has restricted himself within the sum of four dollars per volume; that your petitioner has, on his part, in all respects complied with the provisions of the said acts, entitled " of the publication of the revised statutes " and " of the superintendence of the publication of the revised statutes; " that the four thousand copies delivered as aforesaid to the governor of this state, were placed in the state

library, and have been distributed and are being distributed according to the provisions of the law; and this petitioner believes and states that the said revised statutes so delivered to the governor of this state as aforesaid, were worth and are of the value of two dollars and twenty-eight cents per volume, the maximum price mentioned in said act; that this petitioner, during the time of the publication of said revised statutes, and at the time of delivering the same, supposed and believed that he was to receive the said maximum price for the publication and delivery of the same; that this petitioner, after having delivered the statutes aforesaid, presented his claim to the legislature of this state, asking an appropriation of nine thousand one hundred and twenty dollars, the price and value of said revised statutes, and the said legislature, by an act approved February 6th, 1850, did appropriate to this petitioner the sum of six thousand one hundred and twenty dollars, and refused to allow this petitioner the balance of his claim, which balance amounts to the sum of three thousand dollars, which sum this petitioner believes and states remains justly due and unpaid to this petitioner; and your petitioner represents that he deems himself aggrieved by such refusal of the legislature to allow said just claim of your petitioner against the state, and therefore files this, his petition, in pursuance of an act of the said legislature, approved February 9th, 1850, entitled "an act to direct in what manner and in what courts suits may be brought against the state;" and this petitioner therefore asks the aid of this court in the premises, and that the state may appear before the supreme court and answer this petitioner according to the provisions of law and the rules of this court, and that this petitioner may have such justice and such other relief as the law and very rights of the case may require, and as to this court may seem proper and just.

To the petition the attorney-general, in behalf of the state, put in a general demurrer. On the argument of the cause,

the parties entered into the following stipulation, which was made a part of the case :

"This case is to be heard upon the following agreed state of facts : That in pursuance of the act first mentioned in the petition, the petitioner was selected and appointed by two of the commissioners mentioned in said act to publish the revised statutes ; that the petitioner executed his bond to the governor of the state, which was approved by him ; that the petitioner did then publish the number of copies mentioned in said petition ; that the governor, in the name of the state, did make the subscription for four thousand copies in the book kept in his office for the record of executive proceedings, a copy of which subscription is hereto attached, and made a part of this stipulation ; that by an act of the legislature the sum of six thousand one hundred and twenty dollars has been appropriated to said petitioner, in payment, as the state claims, for the copies of said statutes so subscribed for as aforesaid, and in part payment, as the petitioner claims ; and that said petitioner has drawn and received the amount of said appropriation from the treasurer of this state ; that said petitioner delivered to the governor the said four thousand copies so subscribed for, and that the same have been placed in the state library, and a portion of them distributed by authority of law, and further, that it is not known to the state or any of its officers that said petitioner knew of said subscription at the time of the delivery of said four thousand copies ; that two dollars and twenty-eight cents is a reasonable and fair price for each copy of said statutes so delivered to the state ; that the following statement of the subscription shall make a part of the case :

"DECEMBER 1, 1849.

"On this day the following executive action was had, to wit : By the authority of an act of the legislature of the state of Wisconsin, approved March 17, 1849, entitled 'an act to provide for the publication of the revised statutes of this state,'

the governor of this state is authorized and required, in the name of the state of Wisconsin, to subscribe for and take, when finished, bound and completed, as by said act provided, four thousand copies of the said revised statutes for the use of the state, at a sum not exceeding one dollar and seventy-five cents per volume; provided, however, if the said volume shall exceed seven hundred pages, the sum of twenty-five cents additional per volume for every hundred pages, and proportionately for a less number of excess, shall be allowed. It is therefore ordered by the governor of this state that four thousand copies of the said volume of said revised statutes mentioned in said act be, and the same is hereby subscribed for, on the account of and in the name of the state of Wisconsin, at the sum of one dollar for seven hundred pages of such volume, and at the rate of twenty-five cents additional for every hundred pages of excess over and above the said seven hundred pages, as provided by said act.

" By the Governor,                    NELSON DEWEY."

*Cothren, Arnold & Sharpstein*, for petitioner, claimed and argued that the contract made with the plaintiff, on the part of the part of the state, was in accordance with the provisions of the statutes of the state; that the execution of the bond for the performance of the work created the duty and made it obligatory on the plaintiff to execute it, and on the part of the state it imposed the obligation of payment; that on the execution and deposit of the bond by the complainant for the execution of the work, the governor was bound, by the legislative act, to make a subscription, in behalf of the state, for the work at the maximum price fixed by the act, or to have indicated, at the time, that he should affix a lower sum; that, by the act, the governor was not bound to subscribe until the work was completed and ready for inspection and delivery; that the governor was not invested with any discretion, when he subscribed, to fix the subscription at a lesser sum than the maximum price recognized by the act; that the act authoriz-

Sholes vs. The State.

ing the printing was in accordance with the constitution; that the constitutional objection, if any there was in the case, could not now be raised, when the work had been done and the state had received it; that the state cannot set up, in its own wrong, a constitutional objection to defeat the effect of its own legislative action, after rights by another have been obtained under it; that the governor was not the agent of the plaintiff, under the act of the legislature; that, by making the subscription and receiving the books, the governor had no power or authority to diminish the maximum price, and that by these acts the duty of paying the maximum price became legally fixed upon the state.

*C. James*, on the part of the state, insisted that a legislative act, transcending the powers granted by the constitution, could not invest an individual with any rights or claim against the state; that the plaintiff having been cognizant of and assenting to the appropriation made by the legislature for his compensation, and having accepted and received the amount so appropriated without objection, he was estopped from all legal claim to a greater or additional sum; that being an applicant to the legislature for the passage of the act, after it had passed and he had received the fruits of the legislation in that behalf, it put an end to all further claim, to be asserted by an action at law.

LARRABEE, J. This is the first suit brought under the statute, passed in obedience to the mandate of the constitution, authorizing actions at law against the state.

The petition states that the plaintiff was appointed and employed by the commissioners to publish, in a volume, the revised statutes of the state; and that, in pursuance of the law, Rev. Stat. 740, he delivered to the governor, under his contract, four thousand copies, worth $2.28 per volume, amounting in the whole to the sum of $9,120; that the legislature subsequently appropriated to him the sum of $6,120, and

refused to allow him the balance of his claim, amounting to $3,000, and for which balance this suit is brought.

A stipulation between the attorney for the plaintiff and the attorney-general on behalf of the state has been filed, by which it is agreed that the governor subscribed, in the executive records of his office, for four thousand volumes, at the price of $1.53 per volume; that this sum per volume, amounting in the whole to $6,120, was appropriated by the legislature in payment, as the state claims, and in part payment, as the plaintiff claims, for the books, and which sum the plaintiff received from the state treasurer; that the volumes were delivered according to the contract and placed in the state library, and a portion of them subsequently distributed throughout the state; that it is not known to the state or any of its officers whether the plaintiff knew of the fact of the governor's subscription, nor is it known under what motives the plaintiff did the particular acts set forth in the petition; that the books were reasonably worth the sum of $2.28 per volume.

This is the case, and simple as it seems to be, it has given rise on the argument, to the gravest constitutional and legal questions. On the part of the plaintiff, it is claimed that the admission by the attorney-general, that the books were worth more than was paid for them, is conclusive upon the state, and that the provision of the constitution that private property shall not be taken for public purposes without just compensation, entitles him to demand at our hands a judgment for the full value of his books. On the other hand, it is insisted by the attorney-general, that the law authorizing the employment or appointment of the plaintiff to do this work, is in direct violation of the constitutional provision requiring all printing authorized or required by the legislature for its own use or for the use of the state, to be let by contract to the lowest bidder, and that, therefore, the law was absolutely void, and that the plaintiff did not and could not acquire any

legal rights whatever under it.  It is further contended by the attorney-general, that the price, not exceeding a specified maximum, was left entirely to the judgment of the governor, and he having once fixed it by his subscription, and the books having been delivered under that subscription, the executive action is conclusive, both upon this court and the legislature. That though the copies furnished the state were each actually worth more than the price fixed by the governor, and allowed by the legislature, yet the plaintiff was fully indemnified by the monopoly which he enjoyed from the publication, and the profits which he made on his general sale ; and that whether this be so or not, the plaintiff. having elected to accept the legislative appropriation which was in its terms *in full* of his demand, Session Laws 1850, p. 112, he is estopped from now setting up a claim for what really might be an equitable compensation.

I shall consider these arguments in the order in which they have been stated.

The plaintiff claims that he is entitled to maintain this action because his books were worth more than he has received for them, and that private property cannot be thus taken for public use without just compensation.  A very reasonable proposition, and one, which standing by itself, and unaccompanied with the facts in this case, would probably not be disputed by the attorney-general, nor indeed, by any one. But what are the facts ?  The plaintiff agrees by his delivery of the books under the subscription of the governor, to furnish them at a certain price, and which price he has already been paid.  Now, can it be said that this is a *taking* of private property for public use, which entitles the owner to a *quantum valebat ?*  Does the state, in purchasing property of one of its citizens, or accepting his services under a contract, though it should turn out that that property or those services were worth more than the stipulated price, become liable for all time thereafter to an action to recover whatever that prop-

erty or those services may be proved to be worth ?    Such a doctrine cannot be .entertained for a moment.    The idea is certainly an original one, and could not have occurred either to the barons at Runymede, or the framers of our constitution. A contract is a contract, whether made between individuals or between states, or between a state and an individual, and all parties competent to contract are bound by it.    The provision in regard to taking private property for public purposes, was intended to indemnify the individual against the acts of the state in its sovereign political capacity, and had no reference to mere ordinary contracts between the state and one of its citizens.

This is the argument offered to sustain the claim of the plaintiff.    It was, however, further contended, that the law itself fixed the price at which the state was to receive these books.    But it is impossible to give it this construction, unless we reject entirely that part of the law authorizing the governor to subscribe at a price *not exceeding* a certain amount. The law certainly implies a discretion, or it is utterly without meaning.    The governor was made the agent of both parties, to subscribe for at a price not exceeding a specified maximum, and accept the books when completed according to the conditions of the contract, and it cannot now be urged that the plaintiff was ignorant of the price fixed by that subscription, for it was his right to have ascertained it, and the duty of no one to have informed him of it.    He entered into the contract with his eyes open, and knew, or ought to have known that this discretion was placed iu the hands of the governor.    If he feared an illiberal or unjust decision, he should not have entered into the contract.

This, I believe, disposes of the whole of the argument of the plaintiff's counsel, and presents a case, which had it arisen between individuals, would never have reached the dignity of contested argument, but would have been decided as soon as stated.

In the view already taken of the case, it is not necessary to examine the grounds of defense urged by the attorney-general, but as the matter was elaborately argued, and involves a constitutional question, it may as well be disposed of now.

It is said that the law under which these books were published, is in violation of section 25, article 4 of the constitution. This provision, considered alone, includes all mere mechanical printing required for the use of the state in all its departments. It is intended, in this regard, to remove from the officers of government the opportunity or incentive to traffic in official power, and to confine their action within the simple sphere of legitimate official duty. It, perhaps, would have been well if the revised statutes could have been published under the advantages of the competition provided by the constitution for the ordinary printing of the state, for political morals would not have received the shock, nor the state have suffered the reproach which has been more than probably, unjustly, the result of the law under which they were published. The charge of fraudulent legislation in the inception of the law, which has been assigned by the attorney-general as a reason for the executive action, can have no weight as an argument with this court. It might, if substantiated, have been a legitimate consideration for the executive or the legislative branch of the government, in the exercise of the discretion given by the contract itself to the former, and in the measure of compensation accorded by the latter; but here it is entirely out of place.

Section 21, article 7 of the constitution, directs that the legislature shall provide for the speedy publication of all statute laws, and of such judicial decisions as may be deemed expedient.

This provision we do not regard as dependent upon or necessarily connected with the provision in relation to printing. While it is true that the employment of the art of printing is the best *means* of publication, still *publication* cannot be confined to the limited signification of mere *printing*,

but comprehends the exercise of additional labor and skill. This provision implies a discretion to be exercised in the method of publication; for instance,—that the general laws which cannot be in force until published, shall be published in the public journals, that being the most speedy method; or in pamphlet form, that being more convenient for many purposes; or even by proclamation at the door of the court house in each county, and that the whole body of the laws and the decisions of the supreme court shall be published in the more permanent form of a bound book. All these would be different forms of publication, and all would answer the constitutional requirement; and it is obvious enough that in many instances the object could not be accomplished under a contract for mere mechanical printing.

But it is said, that the legislature having made an appropriation which in its terms was to be *in full* for these books, and the plaintiff having accepted and drawn from the state treasury the amount of that appropriation, he is estopped, as it were, from setting up this claim.

To this argument of the attorney-general, I have heard no answer; nor is it perceived how any can be given. As between man and man, it admits of no question; and I cannot conceive that the circumstance of one of the parties being a state, can affect the matter in the slightest degree. An individual contracts with his state, not as his sovereign, but as he would with any other municipal power, or with an individual; and having, with a full knowledge of the facts, received compensation in full, it is impossible that such a case constitutes an exception to the general rule, by which a party is concluded by his acceptance in full, where there is no pretense of fraud or mistake. Such were the terms upon which the appropriation was made, and such the terms upon which the money was drawn from the treasury. There could be no mental or other reservation, on the part of the plaintiff, which could in any way bind the state.

We are, therefore, all of opinion, upon the whole case, that the plaintiff has failed to substantiate his claim against the state, and judgment must be rendered accordingly.

Judgment against the plaintiff for costs.