Jackson vs. The State.

JACKSON, imp., Plaintiff in error, vs. THE STATE, Defendant in error.

*December 24, 1891 — January 12, 1892.*

CRIMINAL LAW AND PRACTICE. *(1, 2) Evidence: Admission of stenographer's notes of testimony of deceased witness given on former trial. (3) Assistant counsel: Former district attorney who had also appeared in civil action. (4) Evidence of good character: Instructions to jury.*

1. On the second trial of a criminal case the testimony of a deceased witness, as taken down by the official stenographer at the former trial, may be received in evidence on behalf of the prosecution.

2. The testimony of the stenographer that, while he does not recollect the fact, yet he thinks he took down all the questions put to said witness, and his answers, and that he believes they were substantially correct, is sufficient to authorize the admission of his notes of such testimony.

3. The district attorney who conducted the proceedings before an examining magistrate against a person charged with the larceny of certain wheat, also appeared for the defense in an action of replevin brought by the accused against the officer who had seized the wheat. *Held,* that such appearance of the district attorney in the civil action did not render it improper for the trial court to appoint him to assist a new district attorney upon a subsequent trial of an information against said accused for the larceny.

4. On a trial for larceny, the evidence against the defendant being wholly circumstantial, and he having introduced evidence of his

Jackson vs. The State.

good character, the court erred in refusing to instruct the jury, as requested, that in such a case evidence of good character was of special importance, and in charging that when a clear case of guilt is made out on the proof evidence of prior good character is, comparatively speaking, of little importance.

ERROR to the Circuit Court for *Waukesha* County.

The plaintiff in error, *George Jackson*, was married March 11, 1889. He was a farmer and resided in the town of Eagle, on the road leading from the village of Eagle, near the center of section 22 of that town, and running directly north about three miles; then northeasterly about half a mile to McCabe's corner; and from thence easterly, on a very crooked road, for about a mile, to his residence in section 2. His brother, Henry, also lived with him. There was also a highway running from McCabe's corner directly north for nearly a mile; thence westerly for about a mile; and thence in a southwesterly direction for about three miles, where it passed the house and barn of William Summers.

Upon the night of December 21, 1889, Summers' barn was broken open, and about twenty bushels of wheat stolen therefrom. The next day Summers swore out a search-warrant, and the officer having the same seized about twenty bushels of wheat found in the granary of the said *George* and Henry Jackson, on their farm described, as and for the wheat which had been stolen. On December 23, 1889, Summers also swore out a warrant against the said *George* and one William Sones, and they were arrested and held to bail. An information was thereupon filed, charging, in substance, that on December 21, 1889, at the town of Eagle, in Waukesha county, the said *George Jackson* and Sones did wilfully, feloniously, and burglariously break and enter, in the night time, the granary building of William Summers, with intent then and there to commit the crime of larceny, against the peace and dig-

nity of the state of Wisconsin.   To that information both *George Jackson* and Sones pleaded not guilty.

The theory of the state was that *George* and Sones were at the village of Eagle late on the previous evening, with a span of horses and double wagon; that, instead of going to *Jackson's* farm by the direct road described, they went westerly from Eagle for about a mile, and then went in a ·northwesterly direction for about three miles further, ·till they struck the road mentioned, running past Summers' place in section 5, and about half· a mile northeast of Summers' place; that they then turned and went west and south, around Summers' place, and came back on the road previously described, and stopped at Summers' barn, and there took the wheat mentioned, and then went by the road so running in a northeasterly direction until about a mile north of McCabe's corner, and thence south to McCabe's corner, and thence easterly to *Jackson's* place, where the wagon was standing in the barn-yard the next morning, with no wheat in it.   It was claimed that said wagon could be traced by reason of the fact that one of the wheels wobbled and made an irregular track for the whole or part of that distance.   The accused gave evidence tending to show that *Jackson's* wagon had no such wheel and made no such track.

Soon after the arrest the said *George* and Henry Jackson brought an action of replevin against the officer who had seized said wheat on the search-warrant, and, after a trial was had therein, a verdict was found in favor of the Jacksons and against the officer.   Judgment was thereupon entered in that replevin action accordingly, and the same was never appealed from, and remained in full force and effect.

At the term of the court at which this criminal action was last tried the said Sones made default by failing to appear, and his recognizance was thereupon forfeited.   The trial thereupon proceeded against the said *George* alone.

At the close of that trial, and after the jury had been out for eleven and one-half hours, they brought in a verdict of guilty in the manner and form charged in said information. The court thereupon sentenced the said *George Jackson* to imprisonment in the state prison for one year, and judgment was entered accordingly. To reverse that judgment he has sued out this writ of error.

*E. Merton*, for the plaintiff in error.

The *Attorney General* and *J. M. Clancey*, Assistant Attorney General, for the defendant in error, upon the question of admitting the testimony of a deceased witness given at a former trial, cited *State v. Frederic*, 69 Me. 400; *U. S. v. Macomb*, 5 McLean, 287; *Comm. v. Richards*, 18 Pick. 434; 1 Greenl. Ev. sec. 163; *Kendrick v. State*, 10 Humph. 479; *Brown v. Comm.* 73 Pa. St. 321; Cooley, Const. Lim. 388; *State v. McO'Blenis*, 24 Mo. 402; *State v. Baker*, id. 437; *State v. Fitzgerald*, 63 Iowa, 268; *Hair v. State*, 16 Neb. 601; *People v. Murphy*, 45 Cal. 144; *Johnson v. State*, 1 Tex. App. 344.

CASSODAY, J. It appears that there was a former trial of this case, and the jury disagreed. Upon that trial the complaining witness, William Summers, was examined as a witness on the part of the state, and cross-examined on the part of the accused. After that trial, and before the last trial, that witness had died; and his testimony, as taken by the stenographer on the former trial, was admitted in evidence upon this last trial against objection. It is claimed that such ruling was an infringement of a right secured to the accused by that clause of the constitution of this state which declares that "in all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." Sec. 7, art. I.

This language is quite similar to that contained in art. VI of the amendments to the constitution of the United

States. In *State v. Cameron*, 2 Pin. 499, STOW, C. J., said: "The trial by jury, as it existed of old, is the trial by jury secured by our national and state constitutions. It is *not granted* by these instruments; it is more,— it is *secured*. It is no American invention. Our fathers brought it with them to this country more than two centuries ago, and by making it a part of the constitution they intended to perpetuate it for their posterity, and neither legislatures nor courts have any power to infringe even the least of its privileges." That language is quoted approvingly by RYAN, C. J., in *In re Eldred*, 46 Wis. 553.

Thus it appears that the right of the accused to meet the witnesses face to face was not granted, but secured, by the constitutional clauses mentioned. It is the right, therefore, as it existed at common law that was thus secured. That right was subject to certain exceptions. One of these exceptions was that the declarations of a murdered person, made when he was at the point of death and every hope of this world gone, as to the time, place, and manner in which, and the person by whom, the fatal wound was given, are admissible in evidence, notwithstanding such deceased person was not sworn nor examined, much less cross-examined. This court has frequently held that the constitutional clause quoted is no bar to the admission in evidence of such declarations. *State v. Cameron*, 2 Pin. 490; *Miller v. State*, 25 Wis. 387; *State v. Martin*, 30 Wis. 223; *State v. Dickinson*, 41 Wis. 308. In these cases it is, in effect, said that such rule as to the admission of such dying declarations was well settled before the adoption of our constitution, and that the same was not abrogated by the clause of the constitution quoted.

The testimony of a deceased witness, given upon a former trial, would seem to be admissible upon the same theory. "The chief reasons for the exclusion of hearsay evidence," says Mr. Greenleaf, "are the want of the sanction

of an oath and of any opportunity to cross-examine the witness. But where the testimony was given under oath, in a judicial proceeding in which the adverse litigant was a party, and where he had the power to cross-examine and was legally called upon so to do, the great and ordinary test of truth being no longer wanting, the testimony so given is admitted, after the decease of the witness, in any subsequent suit between the same parties." 1 Greenl. Ev. § 163. In speaking of criminal cases, Mr. Cooley says: "If the witness was sworn before the examining magistrate, or before a coroner, and the accused had an opportunity then to cross-examine him, or if there were a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party." Cooley, Const. Lim. (6th ed.), 387, citing numerous cases. The attorney general cites numerous cases under similar constitutional provisions to the same effect.

Of course, to be admissible, such former testimony should be established or identified with reasonable certainty. Here the stenographer testified, in effect, that while he did not recollect the fact, yet that he thinks he took down all the questions put to the witness, and his answers, and that he believed they were substantially correct. Counsel contend that this was not sufficient to authorize such admission, within the rule of *Zitske v. Goldberg,* 38 Wis. 216, and *Elberfeldt v. Waite,* 79 Wis. 284. In neither of those cases had such testimony been taken down by the official court reporter. In each it was taken down by a justice of the peace. In the former it was said by the present chief justice that "the minutes of testimony taken by a justice of the peace on a trial before him are subjected to no such scrutiny [as in a bill of exceptions], and possess none of

Jackson vs. The State.

these important and essential elements of verity. On the contrary, they are made in the haste and confusion of trials, generally by men who are quite unused to the business; and no power to make corrections after the trial is vested in any one. Hence the reasons for admitting such testimony when it is found in a settled case or bill of exceptions, entirely fail when the offered testimony is contained in the justice's minutes." Mr. Greenleaf says that "it was formerly held that the person called to prove what a deceased witness testified on a former trial must be required to repeat his *precise words*, and that testimony merely to the effect of them was inadmissible. But this strictness is not now insisted upon in proof of the crime of perjury; and it has been well remarked that to insist upon it in other cases goes in effect to exclude this sort of evidence altogether, or to admit it only where, in most cases, the particularity and minuteness of the witness' narrative, and the exactness with which he undertakes to repeat every word of the deceased's testimony, ought to excite just doubts of his own honesty and of the truth of his evidence. It seems, therefore, to be generally considered sufficient if the witness is able to state the substance of what was sworn on the former trial. But he must state in substance the whole of what was said on the particular subject which he is called to prove." 1 Greenl. Ev. § 165. Since the proof of such former testimony may be different upon a new trial, it becomes unnecessary, in the view we have taken of the case, to say more about it here.

At the time of the arrest Mr. Tullar was the district attorney, and conducted the proceedings before the examining magistrate. He also appeared on the defense for the officer in the replevin action. We do not think such appearance precluded him from assisting the new district attorney upon the last trial. The replevin suit necessarily involved substantially the same facts, and not to have ap-

peared in that suit would have placed him at a great disadvantage when he came to the trial of the criminal case. Having become thus equipped, it was certainly very proper that he should be continued in the case to its completion.

Error is assigned because the court, among other things, charged the jury that "the defendant has given evidence on this trial tending to show that, prior to the time of the alleged commission of the offense charged against him, his general reputation in the community where he resided and was known was that of an upright, honest man; and the testimony stands uncontradicted. Formerly this evidence was only received in cases where there was some doubt of guilt. That was the equivalent, almost, of holding that evidence of good character could only be received in cases where it was unnecessary for the defendant to introduce the same to secure an acquittal. . . . But, where a clear case of guilt is made out on the proof, evidence of prior good character is, comparatively speaking, of little importance. It is a matter of common knowledge that men who have sustained excellent characters for honesty have been detected in the commission of serious crimes, and when they are so detected, and their guilt clearly proved beyond a reasonable doubt, then prior good reputation should not shield them from just punishment." We are constrained to hold that some of these expressions in the charge, as applied to the facts in the case, tended to mislead the jury into the belief that this was a case in which good character was of very little or no importance. It is true that a somewhat similar expression in a charge was sustained in *State v. Leppere*, 66 Wis. 359, 360, but in that case the evidence, though conflicting, was direct. It is there said that, "whenever such evidence, in connection with all the testimony in the case, is sufficient to generate a doubt, then the prisoner is entitled to the benefit of it, regardless of whether such other evidence on the part of the state is direct or circum-

stantial." · In a portion of the charge in the case at bar not quoted, it is strongly intimated that evidence of prior good character is particularly important in " cases resting upon circumstantial evidence." The evidence in the case at bar is all circumstantial. The court was requested to charge, in effect, that in such a case " evidence of good character should have *great* weight with the jury," and that they " should carefully consider the good character of the defendant with the other evidence in the case," and that if, after such careful consideration, they should have a reasonable doubt as to the guilt of the accused, then it was their duty to acquit. It is true that instruction, as requested, appears to be objectionable in attempting to qualify the evidence by the word " great," but it called the attention of the court to the fact that the evidence against the accused was all circumstantial, and hence that evidence of good character was of special importance. It was therefore error not to give some such instruction. *Conners v. State,* 47 Wis. 527. There are some things in the case well calculated to generate grave doubt as to the guilt of the accused, and hence what was said in the charge about evidence of good character being of little importance where a clear case of guilt is made out on the proof, had no application to the case on trial, and hence naturally tended to mislead the jury.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

