STATE of Wisconsin, Plaintiff-Respondent,

v.

Marvin L. BEAUCHAMP,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2009AP806–CR. Oral argument January 4, 2011.
—Decided May 3, 2011.*

2011 WI 27

(Also reported in 796 N.W.2d 780.)

1

2

For the defendant-appellant-petitioner there were briefs and oral argument by *Craig S. Powell, Kohler & Hart, LLP,* Milwaukee.

For the plaintiff-respondent the cause was argued by *Maura F.J. Whelan,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of a published court of appeals decision[1] in a case arising from a shooting on a Milwaukee street on a summer morning. The murdered man, Bryon Somerville, made statements to an ambulance driver and a police officer just before he died that gave a brief description of his assailant—a man named Marvin, whose last name Somerville did not know, who was dark-skinned with "a bald head and big forehead." Somerville distinguished him from another man named Marvin by saying he meant "big head Marvin." Other witnesses gave statements about seeing Marvin Beauchamp at the scene and seeing him shoot Somerville point blank, statements they later said had been coerced and were untrue. The case proceeded to trial in the Circuit Court for Milwaukee County, the Hon. Jeffrey A. Wagner presiding. When two witnesses testified that their previous statements implicating Beauchamp had been lies coerced by the police, the court permitted the State to impeach their testimony by cross-examining them with their prior inconsistent statements. The jury convicted Beauchamp of first-degree intentional homicide while using a dangerous weapon. Beauchamp appealed, arguing that he is entitled to a new trial because the admission of the Somerville statements and the prior statements of the two recanting witnesses violated his constitutional rights to confrontation and due process. The circuit court admitted the statements under the dying declaration and prior inconsistent statement hearsay exceptions found in Wis. Stat. §§ 908.045(3) and 908.01(4)(a)1, respectively. The court of appeals affirmed the circuit court's rulings on both issues.

---

[1] *State v. Beauchamp,* 2010 WI App 42, 324 Wis. 2d 162, 781 N.W.2d 254.

¶ 2.  Beauchamp argues that the circuit court erred in admitting into evidence the statements made by Somerville prior to his death because there was no opportunity for Beauchamp to cross-examine Somerville about his statements, and Beauchamp was therefore deprived of his constitutional right to confront the witnesses against him.[2] He argues that the hearsay rules' so-called "dying declaration" exception, applicable to statements made by a declarant who believes he is facing imminent death, is not compatible with the holding of *Crawford v. Washington*,[3] a case in which the United States Supreme Court reaffirmed the confrontation of witnesses as "the only indicium of reliability sufficient to satisfy constitutional demands"[4] for testimonial statements. Beauchamp argues that while the *Crawford* Court declined to rule on whether or how its bright line rule applied to dying declarations, its holding compels this court to exclude all unconfronted testimonial hearsay statements, including dying declarations.

¶ 3.  Beauchamp further argues that even if a hearsay exception for dying declarations was recognized and

---

[2] "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' We have held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)). Article 1, Section 7 of the Wisconsin Constitution guarantees the accused, inter alia, "the right . . . to meet the witnesses face to face . . . ."

[3] *Crawford v. Washington*, 541 U.S. 36 (2004).

[4] *Id.* at 68–69 ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.")

implicitly incorporated by the framers of the United States Constitution in the Confrontation Clause,[5] it is now time to abrogate the common law on this point. He claims that the rationales given for the exception, such as wide acceptance of particular religious beliefs and the evidentiary necessity of such statements, are now antiquated and irrelevant. Beauchamp argues that he is entitled to a new trial because Somerville's statements implicating Beauchamp were testimonial statements that were admitted into evidence in violation of his right under *Crawford* to test their reliability by cross-examination, because there is no longer a basis for presuming the reliability of such statements, and because in fact there are reasons to doubt it.

¶ 4.   Beauchamp also claims that the admission of the two witnesses' prior inconsistent statements violated his right to due process.[6] This court has stated

---

[5] *See,* e.g., *Crawford,* 541 U.S. at 54: "[T]he [Sixth Amendment] 'right . . . to be confronted with the witnesses against him' . . . is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."

[6] The right to due process of law is guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. *See Malloy v. Hogan,* 378 U.S. 1, 6 (1964) (holding that the Fourteenth Amendment makes the Fifth Amendment applicable to the states). Article 1, Section 7 of the Wisconsin Constitution provides the following guarantees:

> In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

that due process requirements are satisfied in such a situation so long as the declarant is "present and subject to cross-examination."[7] Specifically, he argues that in order to protect a defendant's due process right to have unreliable prior inconsistent statements excluded, this court should discard that standard and instead adopt a multi-factor test set forth by the Seventh Circuit Court of Appeals in *Vogel v. Percy.*[8] He contends that if the court were to apply the *Vogel* test, under which the availability of the declarant for cross-examination is just one consideration among several, the statements in question would be deemed too unreliable to be admitted, and he contends that their erroneous admission was a violation of his right to due process and thus entitles him to a new trial.

■

¶ 5. We hold that the admission of the dying declaration statement violates neither Beauchamp's Sixth Amendment right to confront witnesses nor his corresponding right under the Wisconsin Constitution.[9]

[7] *Robinson v. State,* 102 Wis. 2d 343, 349, 306 N.W.2d 668 (1981).

[8] *Vogel v. Percy,* 691 F.2d 843, 846–47 (7th Cir. 1982). The court cited a Fifth Circuit case establishing the following "guidelines" for determining "whether substantive use of a prior inconsistent statement would comport with due process":

(1) the declarant was available for cross-examination; (2) the statement was made shortly after the events related and was transcribed promptly; (3) the declarant knowingly and voluntarily waived the right to remain silent; (4) the declarant admitted making the statement; and (5) there was some corroboration of the statement's reliability.

[9] The concurrence would avoid reaching the question that is squarely before us, the question of whether a dying declaration constitutes an exception to an accused's Sixth Amendment

As the court of appeals noted, "the Sixth Amendment's guarantee of the confrontation right does not apply 'where an exception to the confrontation right was recognized at the time of the founding.' "[10] Beauchamp

right to confrontation. We do not think it is appropriate to dodge this question. First, the record is sufficiently developed with evidence to establish, as even defense counsel essentially conceded at trial, that the statements involved here constitute dying declarations under Wis. Stat. § 908.045(3). Second, the parties have fully briefed the question presented. Third, the Supreme Court has set forth principles in Giles and Crawford that get us to an answer on this question. And fourth, many other jurisdictions have answered this question. The United States Supreme Court was barred, given the procedural history of the case before it in Michigan v. Bryant, from addressing the question of dying declarations; as a matter of state law, the opportunity for that legal theory had been deemed waived below. *See Michigan v. Bryant,* ___ U.S. ___, 131 S. Ct. 1143 (2011) (holding that unconfronted statements made by a shooting victim to police on the scene were nontestimonial and therefore admissible without violation of the Confrontation Clause). Had the Bryant Court had a properly developed record and properly presented question regarding a dying declaration, it might well have chosen to address that question instead.

The *Bryant* Court acknowledged that it was reviewing "a record that was not developed to ascertain the 'primary purpose of the interrogation.' " *Id.* at 1163. However, the first step in the Court's analysis, *id.* at 1163–65, focused on "the available evidence, which suggests that [the victim] perceived an ongoing threat." *Id.* at 1164 n.16. Nothing in the Court's analysis indicated that every incident in which a shooting victim is treated by emergency responders constitutes an "ongoing emergency" such that the victim's statements are rendered non-testimonial. Having granted the petition for review in this case and having the benefit of a properly developed record, we see no need to leave this important question to be answered another day.

[10] *State v. Beauchamp,* 324 Wis. 2d 162, ¶ 11 (citing *Giles v. California,* 554 U.S. 353, 128 S. Ct. 2678, 2682 (2008)).

8

concedes that the dying declaration exception was an established hearsay exception at common law. The *Crawford* Court acknowledged the dying declaration hearsay exception and indicated that the exception might be an exception that survives a Confrontation Clause challenge.[11] Without a direct answer from *Crawford* on this point, we are given the task of resolving this question by applying the principles set forth in *Crawford* and a related case, *Giles v. California*,[12] which bases its holding on an analysis of what specific hearsay exceptions were permitted at common law at the time of the ratification of the Sixth Amendment and were therefore incorporated into its confrontation right. Those principles compel the conclusion that allowing this hearsay exception comports with the protections of the Confrontation Clause. While the United States Supreme Court has yet to give its explicit blessing to the dying declaration exception, it has given us no reason to abandon a principle that is so deeply rooted in the common law. Nor does Beauchamp. The fairest way to resolve the tension between the State's interest in presenting a dying declaration and a defendant's concerns about its potential unreliability is not to prohibit such evidence, but to continue to freely permit, as the law does, the aggressive impeachment of a dying declaration on any grounds that may be relevant in a particular case.[13] In other words, if there is evidence the

---

[11] *Crawford*, 541 U.S. at 56 n.6.

[12] *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678 (2008).

[13] In a concurrence in a dying declaration case, a state court justice critical of the reliability of dying declarations asserted that when jurors hear the dramatic circumstances surrounding a dying declaration, "there is no effective way to challenge its truth and it is more than just likely that the jury will attach undue importance to it and give it undue weight in arriving at

declarant had a motive to accuse falsely, introduce it. If there is evidence that the declarant was cognitively impaired and incapable of perceiving events accurately, introduce it. Such facts may, in particular cases, justifiably undermine the reliability of a dying declaration. The reliability of evidence is an issue for the trier of fact, and the assertion that some dying declarations may be unreliable can not justify the per se exclusion of such potentially valuable evidence.

¶ 6. We are likewise unpersuaded by Beauchamp's argument that the failure to exclude the prior inconsistent statements of recanting witnesses here violated due process rights and, as he argued before the court of appeals, constituted either plain error by the circuit court or prejudicial error by counsel necessitating remand for a *Machner* hearing, when the grounds for the claim is that a test different from Wisconsin's should have been applied and that, if applied, the test would have barred the statements from evidence. The statements in question were admitted without objection and consistent with controlling Wisconsin law. Beauchamp was not prejudiced by his counsel's failure to urge the court to apply the law of another jurisdiction, nor can the circuit court be said to have committed plain error when it applied what was then the controlling law in Wisconsin. There was no violation of Beauchamp's right to due process here.

¶ 7. We therefore affirm the court of appeals.

a verdict." *Kidd v. State,* 258 So. 2d 423, 430 (Miss. 1972) (Smith, J., concurring). A statement about whether such evidence can be successfully challenged cannot be readily disproved, of course, by recourse to appellate case law research given that a case involving a successfully impeached dying declaration that results in an acquittal would not be the subject of appeal.

10

## BACKGROUND

¶ 8.   According to statements by witnesses and testimony at the trial, the conflict that ultimately led to the shooting was a couple's fight over rumored infidelity, though the shooting itself was by a person whose interest in the argument seems impossible to discern from the evidence in the record. On the morning of June 16, 2007, Somerville was angrily going from one residence to another trying to find his girlfriend, Dalynn Brookshire, and a flurry of phone calls were being made to and from Somerville, Brookshire, and her friends and relatives. One of those calls came to Marvin Beauchamp as he was driving home with his girlfriend from an appointment, and his girlfriend testified that after he took that call, they quickly headed toward the Sherman Avenue address where Somerville had said he was going next. They parked a block away, and Beauchamp and his girlfriend took different routes to the house. Dominique Brown, Beauchamp's girlfriend, who had just arrived with him moments before, found Shainya Brookshire, the sister of Somerville's girlfriend, near the house. According to a signed statement given to police but later recanted, Beauchamp's girlfriend told the second woman that "Marvin" was "hiding in the bushes on the side of the house, and he has a gun."

¶ 9.   Witnesses testified to seeing Somerville walk out of the house and hearing Somerville briefly exchange words with someone outside the house. Just before the gunshots, witnesses told police, they heard Somerville say, "Oh, you got a gun. Oh, you're going to shoot me. Shoot me then." In a statement to police that she later said was untrue, Beauchamp's girlfriend said she then saw Beauchamp point a gun at Somerville and shoot him in the stomach from a distance of about five

11

feet. A boy who was selling bottled water at the intersection nearby testified that he saw a man come up from behind the house, saw Somerville walk out of the house, heard the two exchange words, and saw the man shoot Somerville, though when shown a group of photographs that included Beauchamp, he was unable to identify him as the shooter. He then saw the wounded man walk toward his vehicle and open the door before falling to the ground.

¶ 10.   When police and fire department units responded to the call reporting the shooting, that is where they found Somerville, conscious but gravely injured with five gunshot wounds. The EMT who arrived on the scene, Marvin Coleman, testified that he asked Somerville, "Who did this?" Somerville responded, "Marvin." When Coleman, who was an acquaintance of the victim and had recognized his vehicle at the scene, asked, "Who, me?" Somerville responded, "No, big head Marvin."[14]

¶ 11.   Police officer Wayne Young rode in the ambulance with Somerville. In the ambulance, Somerville stated that "Marvin" shot him. An emergency room doctor told Young shortly before Somerville died that his time for asking questions was short. In response to Young's questions, Somerville described "Marvin" as dark-skinned, bald, and having a big forehead. People who had known Beauchamp prior to his arrest in this case described his physical appearance in trial testi-

---

[14] Somerville also repeatedly said things like "Please don't let me die." Those statements were evidence that the statements were made "under belief of impending death," *see* Wis. Stat. § 908.045(3), which was a contested issue at the circuit court and before the court of appeals. However, Beauchamp is not disputing in this review that the statements fit the definition of "dying declaration."

mony in ways that were consistent with the description Somerville provided of the man who shot him. Somerville's girlfriend described Beauchamp as having a bald head and dark skin. An acquaintance who grew up with Beauchamp and was housed in the same county jail with him for three days described him as having "a big head," and "particularly a large forehead."

¶ 12. The two women, Brown and Brookshire, were at the house where the shooting occurred, and it is their "prior inconsistent statements" whose admissibility Beauchamp challenges. Both gave multiple statements to the police. First, each gave initial statements that did not implicate Beauchamp. Second, when reinterviewed by police after other witnesses told the police that the two women had actually been in the front yard quite close to where the shooting occurred, each signed statements that put Beauchamp at the scene with a gun and identified him as the shooter. There was evidence of statements that each feared Beauchamp; his girlfriend's statement to police was that she had received a call from him after the shooting telling her to "keep [her] mouth shut." However, at the preliminary hearing and at the trial, each characterized the statements given to police as lies coerced by law enforcement officers who demanded a specific story. Each recanted the statements to the extent that they implicated Beauchamp as the shooter.

██

¶ 13. At a pre-trial motion hearing, over defense counsel's objection, the circuit court ruled that the evidence of Somerville's statements to the EMT and police officer, as well as the evidence of Somerville's grave wounds, supported a finding that the statements were made while Somerville thought he was dying and that the statements were therefore admissible under Wis.

Stat. 908.045(3) as exceptions to the hearsay rule.[15] The court of appeals rejected Beauchamp's challenge, grounded on the holding in *Crawford*, to the dying declaration exception, reasoning that the *Giles* Court's "deliberate recognition of the Sixth Amendment's reach" and its "further analysis of the pre-founding [dying declaration] cases it cited" made it clear that the dying declaration hearsay exception is not constitutionally prohibited. We review Beauchamp's confrontation clause challenge de novo. "Whether admission of a hearsay statement violates a defendant's right to confrontation presents a question of law that this court reviews de novo." *State v. Weed*, 2003 WI 85, ¶ 10, 263 Wis. 2d 434, 666 N.W.2d 485 (citing *Lilly v. Virginia*, 527 U.S. 116, 136–37 (1999)).

¶ 14. The standard of review for the second issue Beauchamp presents is determined by the fact that the

---

[15] Wis. Stat. § 908.01 provides as follows:

The following definitions apply under this chapter:

(1) Statement. A "statement" is (a) an oral or written assertion or (b) nonverbal conduct of a person, if it is intended by the person as an assertion.

(2) Declarant. A "declarant" is a person who makes a statement.

(3) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

(4) Statements which are not hearsay. A statement is not hearsay if:

(a) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

1. Inconsistent with the declarant's testimony . . . .

Wis. Stat. § 908.02 provides, "Hearsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute."

14

recanting witnesses' prior inconsistent statements were read into the record at trial without objection. Because the claimed error was not preserved by an objection at trial, the court of appeals reviewed the claim as a claim of ineffective assistance of counsel, pursuant to *State v. Carprue*, 2004 WI 111, ¶ 47, 274 Wis. 2d 656, 683 N.W.2d 31 (noting that in the absence of an objection an appellate court addresses issues "within the rubric of the ineffective assistance of counsel"). The court of appeals affirmed the circuit court's judgment and order denying Beauchamp's motion for post-conviction relief seeking a new trial, or in the alternative a *Machner* hearing to pursue his ineffective assistance of counsel claim. For the same reason, the court of appeals reviewed for plain error the circuit court's failure to exclude the statements on the basis of a *Vogel* analysis.[16] The court of appeals held Beauchamp's plain error claim to be without merit because such error must be "obvious and substantial,"[17] and that standard cannot be met in a case such as this where there is not even a citation to the Vogel factors, much less an adoption of the standard, in any published Wisconsin case. It therefore affirmed the judgment and order.

¶ 15. We likewise review the claimed error involving the admission of the prior inconsistent statements recognizing that these are unobjected-to matters. We therefore determine whether Beauchamp is entitled to the Machner hearing he sought in his post-conviction motion and on appeal to pursue a claim of a new trial due to ineffective assistance of counsel. That claim is

---

[16] *See State v. Jorgensen*, 2008 WI 60, ¶ 21, 310 Wis. 2d 138, 754 N.W.2d 77.

[17] *Id.*

premised on the argument that Beauchamp was preju-
diced by his counsel's error in failing to object to the
admission of the statements and also failing to advocate
for the statements to be excluded on due process
grounds based on an allegedly more restrictive standard
adopted by the Seventh Circuit Court of Appeals. We
also must determine whether it was plain error for the
court not to apply the Seventh Circuit's standard sua
sponte.

## I. SOMERVILLE'S DYING DECLARATIONS

¶ 16. Beauchamp argues that the admission of
unconfronted hearsay statements made by Somerville
to the medical and law enforcement personnel who
arrived at the scene violated his constitutional right to
confront witnesses against him, as guaranteed by the
United States Constitution and the Wisconsin Consti-
tution. He contends that a proper reading of *Crawford
v. Washington,* in which the United States Supreme
Court abrogated a previous rule[18] that allowed uncon-
fronted testimonial hearsay deemed reliable by a judge,

---

[18] The rule abrogated was that of *Ohio v. Roberts,* 448 U.S.
56, 66 (1980), which favored a balancing approach applied by
the circuit court for determinations of reliability of uncon-
fronted testimonial statements. After noting that the Court had
held in 1965 that the Sixth Amendment's right of confrontation
is applicable in state as well as federal criminal trials, one
commentator briefly summarized the subsequent history of
Confrontation Clause jurisprudence thus:

Since that time, the Court has tried to define the circumstances
under which statements can be offered by the prosecution against
the accused without having to accord the accused an opportunity
to cross-examine the declarant. Eventually the Court developed a
two-part test: (1) if the statement offered against the defendant
fell within a "firmly rooted" exception to the hearsay rule, cross-
examination could be done away with; (2) but if the statement did

compels the conclusion that the dying declaration hearsay exception is no longer constitutionally permitted. The State responds that the *Crawford* Court declined to address the question of dying declarations, and appeared to leave open the possibility that such statements would be found to constitute an exception to Confrontation Clause guarantees.[19] Further, the State argues here that the analysis in *Giles,* as well as further commentary on the dying declaration hearsay excep-

not fall into such an exception, then cross-examination could be dispensed with only if the prosecution convinced the judge that the statement offered was reliable. In *Crawford v. Washington,* the Court abandoned the two-part test, at least when the statement offered against the defendant qualifies as a "testimonial statement."

Miguel A. Méndez, *Crawford v. Washington:* A Critique, 57 Stan. L. Rev. 569, 571 (2004)(footnotes omitted).

[19] *Crawford* concerned the admission of the defendant's wife's prior statements to police concerning the defendant; the prosecution sought to admit the prior statements to rebut the defendant's assertion of self-defense. The defendant's wife was unavailable to testify in that case due to a relevant marital privilege statute. The Court asserted that confrontation was the only constitutionally sound way to determine reliability, and noted, "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford,* 541 U.S. at 62. Nevertheless, the court conceded the following:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis.*

*Crawford,* 541 U.S. at 56, n.6 (citations omitted).

17

tion in that case, confirms that the Supreme Court has clearly signaled that a dying declaration may safely be deemed an exception to the Confrontation Clause by virtue of its acceptance at common law at the time of the founding.

¶ 17. The State also argues that Somerville's statement to the emergency medical technician (EMT) was not testimonial and therefore is exempted by *Crawford* from the confrontation requirement that applies to testimonial statements. After this case was briefed and argued, the United States Supreme Court decided *Bryant,* which examined the parameters of the "ongoing emergency" rule established by the holding in *Davis v. Washington* that statements to police are non-testimonial when the "primary purpose of the interrogation" that produced them "is to enable police assistance to meet an ongoing emergency." *Davis v. Washington,* 547 U.S. 813, 822 (2006). Though the underlying facts and the statements at issue in this case and *Bryant* are similar, the legal questions presented are different. In *Bryant,* the statements at issue had been admitted under a different hearsay exception, and no factual foundation was established for a finding that they qualified as dying declarations. The Court stated, "Because of the State's failure to preserve its argument with regard to dying declarations, we . . . need not decide that question here." *Bryant,* 131 S. Ct. at 1151, n.1. It thus proceeded with its analysis of whether the *Davis* "ongoing emergency" rule rendered statements made to police by a shooting victim nontestimonial. The Court concluded that the statements were made in the context of an ongoing emergency and deemed them nontestimonial, ruling that the admission of the unconfronted statements did not violate the defendant's constitutional confrontation right. *Id.* at 1167. In her

18

dissent, Justice Ginsburg recapped the brief mentions of the dying declaration hearsay exception in *Crawford* and *Giles* and acknowledged that the Court has yet to address its continued viability:

In *Crawford v. Washington,* this Court noted that, in the law we inherited from England, there was a well-established exception to the confrontation requirement: The cloak protecting the accused against admission of out-of-court testimonial statements was removed for dying declarations. This historic exception, we recalled in *Giles v. California,* applied to statements made by a person about to die and aware that death was imminent. Were the issue properly tendered here, I would take up the question whether the exception for dying declarations survives our recent Confrontation Clause decisions. The Michigan Supreme Court, however, held, as a matter of state law, that the prosecutor had abandoned the issue. The matter, therefore, is not one the Court can address in this case.

*Id.* at 1177 (Ginsburg, J., dissenting) (citations omitted).

¶ 18. The State argues that Somerville's statements to the EMT were nontestimonial,[20] but it does not argue that Somerville's statements to the police officer were nontestimonial. Both sets of Somerville's statements, those made to the EMT and those made to the police officer, were admitted pursuant to the dying declaration hearsay exception. Therefore, while we rec-

---

[20] This argument was not presented below, but the State raised it before this court in light of the fact that an appellate court "may review the record to determine if a statement is admissible under a particular hearsay exception even though the trial court did not admit the statement on that basis." *State v. Kutz,* 2003 WI App 205, ¶ 33, 267 Wis. 2d 531, 671 N.W.2d 660. Our holding in this case makes it unnecessary to address the State's additional harmless error arguments.

ognize the different treatment required by *Crawford* for testimonial and nontestimonial statements, we are presented in this case the question of the dying declaration exception's viability under *Crawford*'s restrictive standard for testimonial statements, and we assume for purposes of our analysis that the statements admitted here pursuant to the dying declaration hearsay exception were testimonial.[21] We consequently acknowledge but need not address further in this case the argument that Somerville's unconfronted statements to the EMT are non-testimonial and for that reason their admission does not violate his confrontation right.

¶ 19.  "[W]hether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review." *State v. Jensen,* 2007 WI 26, ¶ 12, 299 Wis. 2d 267, 727 N.W.2d 518.

¶ 20.  We begin by acknowledging the circuit court's determination that the statements Somerville made to the EMT and to the officer in the ambulance and in the operating room were dying declarations. Beauchamp's counsel conceded that a motion to exclude the statements was unlikely to succeed:

> I am well aware of what the case law says and as it relates to what the State must show. Whether or not the victim either knew he was dying or had a reasonable belief that he was dying. I think it's clear from the

---

[21] We note that under the multi-factor approach taken by *Bryant* in determining whether a statement is nontestimonial under *Davis* because its "primary purpose" is "to enable police assistance to meet an ongoing emergency," a statement that qualifies as a dying declaration under Wis. Stat. § 908.045(3) could, depending upon the circumstances, be categorized as testimonial or as nontestimonial. *See Bryant,* 131 S. Ct. at 1160 (citing to *Davis,* 547 U.S. 813, 827 (2006)).

fire fighter who testified today that the victim at least indicated don't let me die and I think that is one indication that the victim may have been under the impression that he was going to die.

It's also clear to me that what was being done to Mr. Somerville during the time that he was on scene, while in transport and at the facility, the hospital facility, that it's clear that he could have believed he was going to die.

It seems to me also that the information that the victim has indicated was answers that were given upon questions being asked by law enforcement or fire fighters. So, as a result of that I think it would be very difficult for me to do anything other than a pro forma motion to exclude the statements of the victim.

¶ 21.   The circuit court then noted that upon the evidence provided, it would permit the statements to come in under Wis. Stat. § 908.045(3). We agree with the circuit court that the statutory requirements are met on the facts presented.

¶ 22.   There is a dual framework for our analysis, as Professor Daniel Blinka has explained:   "In effect, the government's use of hearsay is regulated by both the rules of evidence and the confrontation clause. Put differently, there are two distinct hearsay rules, one rooted in constitutional law and the other found in evidence law. While there is overlap and even some interrelationship, the two doctrines are nonetheless fundamentally different."[22] The question presented then is, as another court phrased it, "whether the statutorily proper admission of [a] statement was nonetheless an unconstitutional violation . . . ." *Vogel,* 691 F.2d 843, 846 n.9 (7th Cir. 1982).

---

[22] Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence, § 802.301 at 711 (3d ed. 2008).

¶ 23. If we were to accept that the Confrontation Clause, as set forth in *Crawford*'s seemingly unbending declaration, requires that all testimonial statements be subject to confrontation to test their reliability, we would exclude dying declarations as, by definition, unconfrontable, and therefore, statements whose reliability cannot be tested. In fact, where the admissibility of a statement is governed by the *Crawford* analysis, one never reaches the issue of reliability[23] because of the Confrontation Clause threshold question: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford* at 65–69.

¶ 24. But such a seemingly rigid approach cannot prevail here. As noted above, the *Crawford* Court deliberately avoided the question of how such a rule would apply in a dying declaration case. In addition, in *Giles,* the Court made clear that notwithstanding the categorical language employed in *Crawford,* there remain situations in which a defendant may not successfully invoke the Confrontation Clause to exclude testimonial hearsay statements. In *Giles,* the court rejected a California hearsay exception that was a broader version of the exception than the one that was accepted at common law at the time of the Sixth's Amendment's ratification. *Giles* involved a murder case in which the California courts had ruled that statements of the murder victim had been properly admitted under a theory of forfeiture by wrongdoing. As applied in *Giles,*

---

[23] As one law review article author stated, "The key test of *Crawford* for a Confrontation Clause violation is whether the hearsay statement offered against a criminal defendant is testimonial." Michael J. Polelle, The Death of Dying Declarations in a Post-*Crawford* World, 71 Mo. L. Rev. 285, 286 (2006).

the theory had permitted the judge to determine, without a specific showing of the defendant's intent to keep the person from testifying, that the defendant had forfeited by his wrongdoing the right to confront the witness. The *Giles* Court's analysis of the Confrontation Clause issue turned on a determination of the contours of the common law forfeiture rule in existence at the time of the Constitution's drafting, and it made clear that the flaw in the application of the California forfeiture rule was that it permitted evidence that the common law rule in existence in 1791 would have excluded. The Court made two statements in that regard that are of significance to our analysis.

¶ 25.　First, in answering the question of whether a doctrine of forfeiture by wrongdoing comports with the guarantees of the Confrontation Clause, the Supreme Court found that it does so only where there has been a showing of the defendant's specific intent to keep the victim from testifying. The basis for its holding was that there had not been, at the time of the Sixth Amendment's ratification,[24] an exception to the Confrontation Clause for forfeiture by wrongdoing doctrine that required no showing of intent to prevent the witness's appearance at trial. However, the court docu-

---

[24] *Giles,* 554 U.S. 353, 358 (2008) ("We held in *Crawford* that the Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.'") The *Crawford* analysis noted that the Sixth Amendment was ratified in 1791, 541 U.S. 36, 46, and stated, "As the English authorities [cited] above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations." *Crawford,* 541 U.S. at 54–55 (internal citations omitted).

mented the numerous instances in the pre-founding common law where the right to confrontation of testimonial statements had indeed been deemed waived where there *had* been a showing of the defendant's intent to prevent the witness's appearance.

¶ 26. It considered the following fact "conclusive" to the question:

> [The fact of] the common law's uniform exclusion of unconfronted inculpatory testimony by murder victims (except testimony given with awareness of impending death) in the innumerable cases in which the defendant was on trial for killing the victim, but was *not shown to have done so for the purpose of preventing testimony.*

*Giles,* 554 U.S. at 368 (emphasis added). Notably, the Court did not say that the Confrontation Clause barred all testimony admitted pursuant to a forfeiture by wrongdoing doctrine. It merely described what *kind* of forfeiture by wrongdoing doctrine would comport with constitutional guarantees. After all, the Court remanded the case to the California court with the observation that "the court is free to consider evidence of the defendant's intent on remand." *Id.* at 377. In other words, *Giles* stands for the proposition that the permissible contours of the doctrine of forfeiture by wrongdoing, and the point beyond which it becomes a violation of Confrontation Clause guarantees, are co-extensive with the contours of that exception at the time of the founding of our nation and specifically the Sixth Amendment's ratification.

¶ 27. The second statement the Giles Court made that is relevant to this case was its specific reference to the dying declaration exception:

> We have previously acknowledged that two forms of testimonial statements were admitted at common law

24

even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying.

*Giles,* 554 U.S. at 358.

¶ 28.  Given the Court's recent acknowledgement of the dying declaration hearsay exception under the common law at the time of the founding and specifically the ratification of the Sixth Amendment, as well as the assertion of treatise writers such as Wigmore that the exception was not merely in existence but was centuries old by that point,[25] the logic of *Giles* cannot support the conclusion that the hearsay exception afforded for dying declarations offends the constitution. We had concluded as much in 1892 when we considered a challenge based on Article 1, Section 7 of the Wisconsin Constitution, the provision that corresponds to the federal Confrontation Clause. In a case concerning a different facet of the hearsay exception, we explained the scope of the Wisconsin Constitution's confrontation clause:

> It is claimed that such ruling [permitting the introduction, over objection, of testimony from a previous trial when the witness had died] was an infringement of a right secured to the accused by that clause of the constitution of this state which declares that "in all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." Section 7, art. 1. . . .

---

[25] See Wigmore on Evidence § 1430–1431, citing the leading case from 1761, *Wright v. Littler,* which articulated a notion that had even at that point, according to Wigmore, been long accepted. Wigmore states, "The custom of using dying declarations probably comes down as a tradition long before the evidence system arises in the 1500s . . . ." *Id.*

25

[T]he right of the accused to meet the witnesses face to face was not granted, but secured, by the constitutional clauses mentioned. It is the right, therefore, as it existed at common law that was thus secured. That right was subject to certain exceptions. One of these exceptions was that the declarations of a murdered person, made when he was at the point of death, and every hope of this world gone, as to the time, place, and manner in which, and the person by whom, the fatal wound was given, are admissible in evidence, notwithstanding such deceased person was not sworn nor examined, much less cross-examined. This court has frequently held that the constitutional clause quoted is no bar to the admission in evidence of such declarations.

*Jackson v. State*, 81 Wis. 127, 131, 51 N.W. 89 (1892).

¶ 29.  While acknowledging the deep historical roots of the dying declaration hearsay exception, Beauchamp argues that such statements were previously presumed to be reliable and considered to be necessary evidence but that those rationales are no longer tenable. Further, he argues that courts have ignored factors that would tend to show that such statements are likely to be especially unreliable and should therefore be subject to exclusion under *Crawford* just as other unconfronted testimonial statements are. He argues that there is no reason to presume that all dying declarations are reliable given possible motives to accuse falsely and the likelihood that a mortally wounded victim is too cognitively impaired by his injuries to give an accurate account of the crime. He discounts the necessity of such evidence given the advances of forensic science. The State counters that Beauchamp had the opportunity at trial to impeach Somerville's statements pursuant to Wis. Stat. § 908.06 by introducing evidence of any fact that would have called into question the

reliability of Somerville's statements on grounds of malice or mental status, and that he did not do so. As to the presumed reliability of dying declarations, the State points to legal precedent that affirms such a presumption on other than religious grounds.[26]

¶ 30.   The hearsay exception has sometimes been justified on the grounds that a dying person was presumed under the common law to have, due to commonly held religious beliefs concerning the afterlife, such a fear of dying without the opportunity to expiate a lie that the reliability of any statement made in those circumstances was deemed equivalent to that of sworn testimony.[27] As one commentator noted, "The original premise of this assumption was that the fear of divine judgment for lying provided religious assurance that the dying person would speak the truth."[28] As early as 1860, however, a treatise writer disputed the notion that the doctrine's underpinnings were religious:

---

[26] *See,* e.g., *Commonwealth v. Douglas,* 337 A.2d 860, 864 (Pa. 1975) (upholding a dying-declaration exception where a defendant had claimed the exception was "without meaning in our modern society" and rejecting the notion that "the sophistication of mankind today is such that the knowledge of impending death no longer engenders apprehension of the unknown and fails to deter falsehood and is incapable of inspiring truth.") *See also* Fed. R. Evid. 804, Adv. Comm. Notes, Note to Subdivision (b), Exception (2) (1972) ("While the original religious justification for the exception may have lost its conviction for some persons over the years, it can scarcely be doubted that powerful psychological pressures are present.")

[27] *See,* e.g., The *Queen v. Osman,* 15 Cox. Crim. Cases 1, 3 (Eng. N. Wales Cir. 1881)("No person, who is immediately going into the presence of his Maker, will do so with a lie upon his lips.") (cited in *Idaho v. Wright,* 497 U.S. 805, 820 (1990)).

[28] Polelle, *supra,* at 300.

> [A dying declaration] is not received upon any other ground than that of necessity, in order to prevent murder going unpunished. What is said in the books about the situation of the declarant, he is being virtually under the most solemn sanction to speak the truth, is far from presenting the true ground of the admission. . . . [T]he rule is no doubt based upon the presumption that in the majority of cases there will be no other equally satisfactory proof of the same facts. This presumption and the consequent probability of the crime going unpunished is unquestionably the chief ground of this exception in the law of Evidence.

1 Greenleaf, Evidence § 156, editorial note (1860) (cited in Wigmore on Evidence, § 1431).

¶ 31.   We do not disagree with Beauchamp's contention that we live in "a society more secular than the one in which the exception originated."[29] Nor do we

---

[29] Stanley A. Goldman, Not So "Firmly Rooted": Exceptions to the Confrontation Clause, 66 N.C. L. Rev. 1, 24 (1987). For example, whether the religious justification was the "original premise" or not, religiously-based reasoning is cited in cases in ways that can be jarring to a present-day reader. In a case challenging a trial court's admission of a murder victim's statement under the dying declaration hearsay exception, the Supreme Court of Illinois reversed, focusing on the profanity employed in the victim's many statements concerning the accused (e.g., "What will you do if I die; will you hang the damned son of a bitch?", "[I will] meet [the defendant] in hell and have it out with him there," and "You are a hell of a set of doctors not to help a fellow with as little cuts as these." *Tracy v. Illinois,* 97 Ill. 101, 110–11 (Ill. 1880)) The court reasoned that the statement implicating the defendant had to be excluded from the jury on the following grounds:

> Assuming that the deceased was a believer in a future state of rewards and punishments, and such is the presumption where nothing appears to the contrary, the use of profane language immediately preceding the statement is hardly to be reconciled

disagree with his contention that under certain circumstances, factors exist which may undermine the reliability of a particular dying declaration. However, those facts cannot justify eliminating this hearsay exception and creating a per se prohibition against dying declarations on the grounds that such statements are in almost all cases unconfronted and unconfrontable. We find persuasive the California Supreme Court's analysis of this question in *People v. Monterroso*:

> Thus, if, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding," it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.

*Monterroso,* 101 P.3d 956, 972 (Cal. 2004).

¶ 32. We further agree with that court's observation that to exclude such evidence as violative of the right to confrontation "would not only be contrary to all the precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to that sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught." *Id.* (internal citations omitted).

with the assumption that he was at the time of sound mind and impressed with a sense of almost immediate death. . . . It is hard to realize how any sane man who believes in his accountability to God can be indulging in profanity when at the same time he really believes that in a few short hours at most he will be called upon to appear before Him to answer for the deeds done in the body.

*Id.* at 105–06.

¶ 33. This case is an example of that possibility. Notwithstanding advances in forensic science, there was in this case, as in many cases, no fingerprint evidence, no DNA evidence, and no definitive ballistics evidence that would tie the defendant directly to the crime. In any event, of course, such evidence, as valuable as it may be, does not necessarily prove a defendant's guilt any more than its absence necessitates his acquittal.

¶ 34. We therefore, like every state court that has considered the dying declaration exception since *Crawford,* take a position consistent with the language of *Crawford* and *Giles* and decline to hold that the constitutional right to confront witnesses is violated by the admission of statements under the dying declaration hearsay exception. As the State notes, no published decision of any state court in the country has eliminated the dying declaration hearsay exception based on the reading of selected language of *Crawford.* We concur with the courts[30] that have addressed this question after *Crawford*: a hearsay exception as long-standing, well-established and still necessary as this one, as indeed this case illustrates, cannot be lightly dismissed. Regardless of the religious justifications that have been

---

[30] *Cobb v. State,* 16 So.3d 207, 212 (Fla. App. 2009); *People v. Gilmore,* 828 N.E.2d 293, 302 (Ill. Ct. App. 2005); *Wallace v. State,* 836 N.E.2d 985, 996 (Ind. Ct. App. 2005); *State v. Jones,* 197 P.3d 815, 822 (Kan. 2008); *Commonwealth v. Nesbitt,* 892 N.E.2d 299, 310–11 (Mass. 2008); *People v. Taylor,* 737 N.W.2d 790, 795 (Mich. App. 2007); *State v. Martin,* 695 N.W.2d 578, 585–86 (Minn. 2005); *State v. Minner,* 311 S.W.3d 313, 323, n.9 (Mo. App. 2010); *Harkins v. State,* 143 P.3d 706, 711 (Nev. 2006); *State v. Calhoun,* 657 S.E.2d 424, 427–28 (N.C. App. 2008); *State v. Lewis,* 235 S.W.3d 136, 147–48 (Tenn. 2007); *Gardner v. State,* 306 S.W.3d 274, 289 n.20 (Tex. Crim. App. 2009); *Satterwhite v. Commonwealth,* 695 S.E.2d 555, 568 (Va. App. 2010).

articulated for dying declarations over the centuries, this hearsay exception is a crucial one, and it retains its vitality. We disagree with Beauchamp that scientific advances have changed criminal law such that there is always sufficient evidence without admitting the inculpatory words of a dying victim to fairly try a defendant accused of murder.

¶ 35. We therefore affirm the court of appeals' holding that the statements made by Somerville to the EMT and the officer were properly admitted and did not violate Beauchamp's confrontation rights under the state and federal constitutions.

## II.  PRIOR INCONSISTENT STATEMENTS

¶ 36. Beauchamp argues that the court erred when it allowed admission of the prior inconsistent statements of the two women, Brown and Brookshire. As described above, each woman gave initial statements to the police that did not implicate Beauchamp, and then each woman gave a statement detailing that she had seen and heard Beauchamp commit the murder. Each later recanted the portions of the statements implicating Beauchamp. Beauchamp contends that the admission of the inculpatory statements as substantive evidence was error because they are insufficiently reliable and thus their admission constituted a violation of his constitutional right to due process.

¶ 37. The State argues that the statements were properly admitted under Wis. Stat. § 908.01(4)(a) because the women's statements at the preliminary hearing and at trial recanted the portions that implicated Beauchamp. The State argues that the declarants were available for cross-examination at trial, and therefore

31

the admission of the prior statements satisfied the due process test set forth in *Robinson*. The State also notes that any appellate review of unobjected-to matters is governed by the analysis appropriate for claims of plain error or ineffective assistance of counsel. The State's brief also notes that "an appellate court may not conclude that counsel was ineffective without a *Machner* hearing," a proposition stated in *State v. Curtis*, 218 Wis. 2d 550, 554, 582 N.W.2d 409 (Ct. App. 1998).

¶ 38.   We review the unobjected-to admission of the prior inconsistent statements to determine whether Beauchamp is entitled to a new trial due to plain error by the circuit court. Though failure to object ordinarily constitutes waiver of an issue, a defendant is entitled to a new trial where unobjected-to error is "plain error."[31] As this court stated in *State v. Mayo,* the determination of plain error is made in the context of the facts of a case:

> Under the doctrine of plain error, an appellate court may review error that was otherwise waived by a

---

[31] Wis. Stat. § 901.03(1) and (4) state as follows:

Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

(a) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(b) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked. Plain error. . . .

Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge.

party's failure to object properly or preserve the error for review as a matter of right. This court has not articulated a bright-line rule for what constitutes plain error, acknowledging that there is no "hard and fast classification" relative to its application. *Virgil v. State,* 84 Wis. 2d 166, 190–91, 267 N.W.2d 852 (1978). Rather, the existence of plain error will turn on the facts of the particular case. *Id.* Of particular importance is the quantum of evidence properly admitted and the seriousness of the error involved. *Id.* The burden is on the State to prove that the plain error is harmless beyond a reasonable doubt. *State v. King,* 205 Wis. 2d 81, 93, 555 N.W.2d 189 (1996).

*State v. Mayo,* 2007 WI 78, ¶ 29, 301 Wis. 2d 642, 734 N.W.2d 115.

¶ 39.    Additionally, we review whether Beauchamp was prejudiced by his counsel's failure to object to the admission of the statements and whether Beauchamp is, as a result, entitled to a remand for a *Machner* hearing to pursue a new trial via an ineffective assistance of counsel claim.[32] The standard set forth for reviewing a denial of

---

[32] A *Machner* hearing is "a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel." *See State v. Machner,* 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Wis. App. 1979) and *State v. Curtis,* 218 Wis. 2d 550, 555, 582 N.W.2d 409 (1998) (stating that "the lack of a *Machner* hearing prevents our review of trial counsel's performance.") Though he did not directly ask this court to remand for a *Machner* hearing, Beauchamp did seek such a hearing in his post-conviction motion and in his brief to the court of appeals. Given the context in which Beauchamp's due process claim arises, we construe his arguments as seeking either a remand for a new trial because the circuit court's admission of the evidence was plain error, or a remand for the *Machner* hearing that is necessary for him to pursue the claimed error as a claim of ineffective assistance of counsel.

a motion seeking a *Machner* hearing was set forth and applied in *State v. Roberson,* 2006 WI 80, ¶¶ 43–44. There, this court stated that a circuit court may deny a postconviction motion for a Machner hearing "if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief." *Id.,* citing *State v. Bentley,* 201 Wis. 2d 303, 313, 548 N.W.2d 50 (1996). In *Roberson,* this court concluded, "[b]ecause . . . the record sufficiently establishes that Roberson was not prejudiced by his counsel's actions . . . the circuit court did not err in denying Roberson a [*Machner*] hearing . . . ." *Id.*

¶ 40. The law governing the admissibility of such statements is well settled in Wisconsin, and, given the standard of review that governs here, that is dispositive in either analysis. As noted above, this court has stated that due process requirements are satisfied in such a situation so long as the declarant is "present and subject to cross-examination."[33] Both declarants in this situation were present and subject to cross-examination.

¶ 41. Beauchamp urges a different standard for determining whether due process considerations are satisfied by the admission of a prior inconsistent statement: a test in which the availability of the declarant for cross-examination is only one of five factors to consider. That test, as noted above, is taken from *Vogel v. Percy,* 691 F.2d 843, 846–47 (7th Cir. 1982). That court cited a Fifth Circuit case establishing the following "guidelines" for determining whether "substantive use of a prior inconsistent statement would comport with due process":

---

[33] *Robinson v. State,* 102 Wis. 2d 343, 349, 306 N.W.2d 668 (1981).

(1) the declarant was available for cross-examination; (2) the statement was made shortly after the events related and was transcribed promptly; (3) the declarant knowingly and voluntarily waived the right to remain silent; (4) the declarant admitted making the statement; and (5) there was some corroboration of the statement's reliability.

*Id.*

¶ 42.  In *Vogel,* which concerned the prior inconsistent statement of a co-defendant against the defendant in a case arising from a Beloit armed robbery, the co-defendant had given a prior statement to police implicating the defendant, but in trial testimony gave a different version that minimized the defendant's role in the robbery. *Id.* at 844. The Seventh Circuit bolstered its analysis of the admissibility of the statements with consideration of the test originally set forth by the Fifth Circuit, to be used when a court is determining "whether the statutorily proper admission of [the co-defendant's] statement was nonetheless an unconstitutional violation of petitioner's due process rights." *Id.* at 846 n.9. After applying the five factors, the Seventh Circuit concluded that there was no due process violation.[34]

---

[34] The State points out that even if the *Vogel* test were applied, the statements in this case would satisfy the test. We agree. We are hard pressed to see how the application of the test would change the outcome in this case. Each of the applicable factors would in the case of Brookshire's and Brown's statements favor admissibility. Both declarants were available for cross-examination. The statements were made shortly after the events related and were transcribed promptly. Brookshire was not taken into custody, but Brown, who was interrogated while in custody, knowingly and voluntarily waived the right to remain silent. There was corroboration of the statements' reliability because

35

¶ 43. We are unpersuaded that our simple, straightforward and workable requirement for the admission of prior inconsistent statements—that the declarant be present and available for cross-examination —needs any revision, and we decline the invitation to reformulate Wisconsin's standard on this question.

¶ 44. Even if we favored the test set forth in *Vogel,* we could not determine that the circuit court had erred such that Beauchamp was entitled to a new trial. Nor can we determine that counsel's failure to object prejudiced Beauchamp and that he is consequently entitled to a remand for a *Machner* hearing to pursue a new trial via an ineffective assistance of counsel claim. We note that the standard of review governing this issue in this case sets the bar high. We are satisfied that Beauchamp was not prejudiced by his counsel's failure to seek to bar the admission of the statements on the basis of a standard not employed in Wisconsin law. Counsel was not required to urge the circuit court to apply the law of another jurisdiction when Wisconsin had its own test. In light of this standard of review, we agree with the court of appeals that Beauchamp's claims regarding the prior inconsistent statements' admission are without merit.

---

there were statements from other witnesses that corresponded to the facts as presented in the women's prior statements, not least of which were the statements of the murder victim himself. Even the fourth factor, that the declarant admitted making the statement, favors admissibility in this case; although each claimed that the statements were coerced by the police, there were substantial parts of the prior statements that the women themselves did not disavow. The fact that the application of the *Vogel* test would not necessarily change the ultimate admissibility of the statements further undermines Beauchamp's claims of error by the circuit court and trial counsel in regard to their admission at trial.

Where a legal standard has been set forth in another jurisdiction, counsel is free to make an argument setting forth the other jurisdiction's practice as persuasive authority, but it simply cannot be said here either that Beauchamp was prejudiced by counsel's failure to object or that the circuit court erred in permitting the admission of the evidence.

## CONCLUSION

¶ 45. We hold that the admission of the dying declaration statement violates neither Beauchamp's Sixth Amendment right to confront witnesses nor his corresponding right under the Wisconsin Constitution. As the court of appeals noted, "the Sixth Amendment's guarantee of the confrontation right does not apply 'where an exception to the confrontation right was recognized at the time of the founding.' "[35] Beauchamp concedes that the dying declaration exception was an established hearsay exception at common law. The *Crawford* Court acknowledged the dying declaration hearsay exception and indicated that the exception might be an exception that survives a Confrontation Clause challenge.[36] Without a direct answer from *Crawford* on this point, we are given the task of resolving this question by applying the principles set forth in *Crawford* and a related case, *Giles*,[37] which bases its holding on an analysis of what specific hearsay exceptions were permitted at common law at the time of the ratification of the Sixth Amendment and were therefore incorporated into its confrontation right.

---

[35] *Beauchamp,* 324 Wis. 2d 162, ¶ 11 (citing *Giles,* 128 S. Ct. at 2682).

[36] *Crawford*, 541 U.S. at 56 n.6.

[37] *Giles v. California*, 128 S.Ct. 2678 (2008).

Those principles compel the conclusion that allowing this hearsay exception comports with the protections of the Confrontation Clause. While the United States Supreme Court has yet to give its explicit blessing to the dying declaration exception, it has given us no reason to abandon a principle that is so deeply rooted in the common law. Nor does Beauchamp. The fairest way to resolve the tension between the State's interest in presenting a dying declaration and a defendant's concerns about its potential unreliability is not to prohibit such evidence, but to continue to freely permit, as the law does, the aggressive impeachment of a dying declaration on any grounds that may be relevant in a particular case. In other words, if there is evidence the declarant had a motive to accuse falsely, introduce it. If there is evidence that the declarant was cognitively impaired and incapable of perceiving events accurately, introduce it. Such facts may, in particular cases, justifiably undermine the reliability of a dying declaration. The reliability of evidence is an issue for the trier of fact, and the assertion that some dying declarations may be unreliable can not justify the per se exclusion of such potentially valuable evidence.

¶ 46. We are likewise unpersuaded by Beauchamp's argument that the failure to exclude the prior inconsistent statements of recanting witnesses here violated due process rights and, as he argued before the court of appeals, constituted either plain error by the circuit court or prejudicial error by counsel necessitating remand for a *Machner* hearing, when the grounds for the claim is that a test different from Wisconsin's should have been applied and, if applied, would have barred the statements from evidence. The statements in question were admitted without objection and consistent with controlling Wisconsin law. Beauchamp was not preju-

diced by his counsel's failure to urge the court to apply the law of another jurisdiction, nor can the circuit court be said to have committed plain error when it applied what was then the controlling law in Wisconsin. There was no violation of Beauchamp's right to due process here.

¶ 47. We therefore affirm the court of appeals.

*By the Court.*—Affirmed.

¶ 48. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The majority opinion unnecessarily creates an exception to an accused's Sixth Amendment right to confrontation—an exception not yet recognized by the United States Supreme Court. The present case can be decided upon existing law. I therefore do not join the majority in reaching out to create new constitutional law.

¶ 49. I conclude that the victim's comments to the emergency medical technician were not testimonial. The technician's testimony relating to the victim's comments is therefore not barred by the Confrontation Clause and is admissible under the dying declaration exception to the hearsay rule.

¶ 50. I need not determine whether the victim's comments to the police officer were testimonial, a closer call. As I see it, if admitting the police officer's testimony was an error, it was harmless.

¶ 51. For the reasons set forth, I concur.

I

¶ 52. I first address the issue of testimonial and non-testimonial statements raised in *Crawford v. Washington,* 541 U.S. 36 (2004).

¶ 53. The majority opinion suggests that the "fairest way" to resolve the tension between the State's interests in presenting unconfronted testimonial dying declarations and a defendant's concern about unreliability is to "continue to freely permit . . . the aggressive impeachment of a dying declaration . . . ." Majority op., ¶ 5. Yet *Crawford v. Washington* is rather explicit in stating that for testimonial evidence the Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford,* 541 U.S. at 61 (2004).

¶ 54. The Court in *Crawford* elucidated two inferences from its historical review of the Sixth Amendment. First, not all hearsay implicates the core concerns of the Sixth Amendment's confrontation clause. Instead, the confrontation clause focuses on "testimonial statements." Second, "the 'right . . . to be confronted with the witnesses against him,' is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."[1]

¶ 55. *Crawford* held that for testimonial evidence to be admissible absent confrontation, the Sixth Amendment "demands what the common law required: unavailability and a prior opportunity for cross-examination."[2] I acknowledge that the Court left open the possibility that there may be historical exceptions to this discrete and clearly defined right.[3] However, Justice Scalia, writing for the majority of the Court in

---

[1] *Crawford v. Washington,* 541 U.S. 36, 54 (2004) (internal citations omitted).

[2] *Id.* at 68.

[3] *Id.* at 56 n.6.

*Crawford,* explicitly refrained from determining whether historical exceptions, and specifically dying declarations, "must be accepted."[4] Justice Scalia's language is significantly less than a resounding endorsement, nor is it a strong portent of the Supreme Court establishing dying declarations as a historical exception to the *Crawford* rule.

¶ 56.  The Supreme Court has not subsequently determined whether a historical exception to the right of confrontation for testimonial dying declarations "must be accepted." Instead the focus of the Supreme Court's recent Sixth Amendment jurisprudence has been on developing the law surrounding the first inference of *Crawford,* differentiating between testimonial and non-testimonial statements.

II

¶ 57.  I now turn to *Michigan v. Bryant,* ___ U.S. ___, 131 S. Ct. 1143 (2011), which was decided after oral argument in the instant case. Both the State and the defendant submitted letter briefs to the court discussing the effect of *Bryant* on the present case.

---

Similarly, the Supreme Court acknowledged this possibility in *Giles v. California,* 554 U.S. 353, 358 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying" (internal citations omitted).).

[4] *Crawford,* 541 U.S. at 56 n.6 ("Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is *sui generis*" (internal citations omitted).).

41

¶ 58.   In *Bryant,* to the dismay of Justice Scalia (the author of *Crawford*),[5] the Supreme Court clarified the distinction between testimonial and non-testimonial statements made to emergency personnel in a fact situation similar to the case before us. Relying upon the Supreme Court's analysis in *Bryant,* I conclude that the challenged statements made to Coleman, the emergency medical technician in the present case, identifying and describing the shooter, were non-testimonial statements.

¶ 59.   Because I conclude that the victim's statements to Coleman were not testimonial under *Bryant,* I do not join the majority opinion in creating an exception to the Confrontation Clause for testimonial dying declarations. Under the facts of the instant case, it is unnecessary to create a historical exception for testimonial dying declarations, as the majority does today. Under the Sixth Amendment jurisprudence, the statements of the victim to Coleman in the present case are admissible because they are non-testimonial statements and are admissible under Wisconsin's hearsay rules.[6]

---

[5] *See Michigan v. Bryant,* ___ U.S. ___, 131 S. Ct. 1143, 1168, 1170 (2011) (Scalia, J., dissenting) ("Instead of clarifying the law, the Court makes itself the obfuscator of last resort"; "The only virtue of the Court's approach (if it can be misnamed a virtue) is that it leaves judges free to reach the 'fairest' result under the totality of circumstances"; "Unfortunately, under this malleable approach 'the guarantee of confrontation is no guarantee at all.' ").

[6] The admissibility of non-testimonial hearsay statements is governed by the rules of evidence.

In the present case, the circuit court concluded that the challenged statements were testimonial under *Crawford* and fell within the dying declaration exception to *Crawford* and the hearsay rule, Wis. Stat. § 908.045(3).

¶ 60. In *Bryant,* the Supreme Court determined whether statements of a mortally wounded victim made to responding police officers were admissible hearsay statements at trial.[7] The facts of *Bryant* are similar to those in the present case.

¶ 61. In *Bryant,* police officers responded to an emergency: a man had been shot and was lying on the ground, bleeding, next to his car in a gas station parking lot. A number of police officers arrived on the scene, and asked the victim "what had happened, who had shot him, and where the shooting had occurred."[8] The victim responded with truncated answers, indicating "Rick" shot him, and that the shooting had occurred at the back door of Bryant's ("Rick's") house. Emergency medical services arrived within 5 to 10 minutes of the police officers' arrival. The victim's conversation with the police officers ended as he was treated and transported to the hospital, where he died within the hour.

¶ 62. Based on the information police obtained from the victim, they left the gas station, called for backup, and traveled to Bryant's house. When they arrived at the house, Bryant was not there; however, the officers found blood, a bullet on the back porch, a hole in the back door, and the victim's wallet and identification outside the house. Bryant was eventually arrested nearly a year later.

¶ 63. At trial the police officers who responded to the scene testified about the statements the victim made regarding "what had happened, who had shot him, and where the shooting had occurred."[9] The Su-

---

[7] *Bryant,* 131 S. Ct. at 1150.

[8] *Id.* Various officers arriving on the scene asked the victim variants on these three basic questions.

[9] *Id.*

preme Court determined that the testimony was admissible and did not violate the defendant's right to confrontation under the Sixth Amendment because the statements were non-testimonial. The Supreme Court determined that the "primary purpose of" the interrogation was to enable the police officers to meet an ongoing emergency. The primary purpose is illustrated, according to the Supreme Court, by an objective analysis of the informality of the encounter and the questions and answers of the parties. This primary purpose led the Court to conclude that the statements were non-testimonial.

¶ 64.  The Supreme Court concluded that the analysis in determining whether a hearsay statement is testimonial or non-testimonial is an objective analysis of the "primary purpose" of the questioning and the answering.[10] This analysis "requires a combined inquiry that accounts for both the declarant and the interrogator. In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers. . . . The combined approach also ameliorates problems that could arise from looking solely to one participant."[11] To determine the "primary purpose" of an encounter, a court must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties."[12]

¶ 65.  When an encounter is between an individual and the police, the existence of an "ongoing emergency" is among the most important circumstances informing

[10] *Id.* at 1160–62.

[11] *Id.* at 1160–61.

[12] *Id.* at 1156.

the primary purpose of the encounter.[13] The existence, the scope, and the duration of an emergency is dependent upon the type and scope of the danger posed "to the victim, the police, and the public."[14]

¶ 66. The existence of an "ongoing emergency" is, however, not the only factor that informs the determination of the primary purpose of an encounter.

¶ 67. The severity of the victim's medical condition also plays an objective role in evaluating the primary purpose, as it "sheds light on the ability of the victim to have any purpose at all in responding to police questions . . . ."[15]

¶ 68. Another factor is the formality (or lack thereof) of the encounter. While informality does not necessarily indicate a lack of testimonial purpose, it is an important factor in determining the primary purpose of the encounter.[16]

¶ 69. The Supreme Court examined the encounter presented by the facts in *Bryant* objectively, analyzing the circumstances of the encounter and the statements and actions of the declarant and the interrogator, to determine the primary purpose and to determine whether the victim's statements were testimonial or non-testimonial.[17]

¶ 70. The *Bryant* Court determined that the police officers were responding to an ongoing emergency. The police did not know whether the threat was limited to the victim, whether the threat to the victim was over, or whether a threat to the public existed because a gun

---

[13] *Id.* at 1157.
[14] *Id.* at 1162.
[15] *Id.* at 1159.
[16] *Id.* at 1160.
[17] *Id.* at 1160–62.

was used. "At bottom, there was an ongoing emergency here where an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [the victim] within a few blocks and a few minutes of the location where the police found [the victim]."[18]

¶ 71.   The Supreme Court then went on to consider how the victim's condition affected the analysis of the "primary purpose" of the statements that he made. Based upon the victim's condition, lying on the ground of a gas station bleeding from a mortal gunshot wound, and upon the victim's short, truncated responses due in part to difficulty breathing, the Supreme Court determined that a person in the victim's condition cannot be said to have a "primary purpose" of establishing or proving past events potentially relevant to a later prosecution.[19]

¶ 72.   Similarly, the Supreme Court evaluated the statements and actions of the police officers. The officers were responding to an emergency call. "[T]hey did not know why, where, or when the shooting had occurred."[20] The questions they asked were questions necessary to assess the situation, the threat to the victim and themselves, and the potential for an ongoing threat to the public. The questions the officers asked were initial inquiries of the type that often produces non-testimonial statements.[21]

¶ 73.   Lastly, the Supreme Court examined the informality of the encounter in determining the "primary purpose" of the statements. The Court evaluated

[18] *Id.* at 1164.
[19] *Id.* at 1165.
[20] *Id.*
[21] *Id.* at 1166.

the statements in the case within a spectrum of informality bounded by a harried 911 call and a formal station-house interview.

¶ 74. The statements in *Bryant* fell nearer to the harried 911 call in *Davis v. Washington*[22] than to the formal station-house interview in *Crawford.*[23] In *Bryant,* the Supreme Court determined that the officers and the victim were in a fluid emergency situation; there was little to no structure in the questions asked, and the victim's responses were truncated and punctuated with his questions regarding when emergency medical aid would arrive. Ultimately the *Bryant* Court concluded, "the circumstances lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements."[24]

¶ 75. Based on an objective evaluation of the circumstances in which the encounter occurred and the statements and actions of both of the parties, the Supreme Court concluded that the "primary purpose" of the victim's statements in *Bryant* was to enable police to respond to an ongoing emergency. Accordingly, the Supreme Court concluded that the statements in *Bryant* were non-testimonial and were properly admitted at trial.

¶ 76. *Bryant* is informative for the present case. In the present case, emergency medical services and the police responded to a call reporting a shooting. Upon arriving on the scene, they found a man who had been shot numerous times, lying next to his car and bleeding.

¶ 77. Marvin Coleman, a heavy equipment operator and trained emergency medical technician with the

[22] *Davis v. Washington,* 547 U.S. 813 (2004).

[23] *Crawford v. Washington,* 541 U.S. 36 (2004).

[24] *Bryant,* 131 S. Ct. at 1166.

Milwaukee Fire Department, responded to the scene. Coleman testified that upon arriving at the scene he recognized the car near where the victim lay as belonging to an acquaintance. When he approached the victim he recognized him as that acquaintance. According to Coleman's testimony, the victim recognized him and implored, "Please don't let me die, please don't let me down." Coleman testified that in response he stated, "We're not going to let you go, we'll do our best," and that he asked the victim, "Who did this?"

¶ 78.  Coleman testified that the following brief exchange occurred in response to that question. The victim responded, "Marvin." Marvin Coleman responded, "Who, me?" and the victim responded, "No, Big Headed Marvin."

¶ 79.  Coleman then asked the victim what had happened. Coleman testified that the victim responded he "was in the house arguing with some woman and he felt like he was lured outside and that's where [the shooting] happened."

¶ 80.  Applying the analysis used by the Supreme Court in *Michigan v. Bryant,* I conclude that the victim's statements made to Coleman were non-testimonial.

¶ 81.  The circumstances in which the encounter between the victim and Coleman took place are substantially similar to the circumstances in *Bryant.* The victim was lying next to his car, bleeding from a mortal gunshot wound. The distinctions in the circumstances of this case are that Coleman is an EMT, not a police officer, and Coleman was acquainted with the victim.

¶ 82.  These distinctions further support the conclusion that under an objective analysis, the primary purpose of the statements to Coleman was not to establish or prove past events potentially relevant to a later prosecution.

¶ 83. That Coleman was an emergency medical technician, not a police officer, and was acquainted with the victim objectively increases the informality of the situation.

¶ 84. Emergency medical technicians play a distinct role from police officers in responding to an ongoing emergency. However, these emergency service people (similar to police officers upon arriving at the scene of an emergency) must ensure that the scene is secure for the victim, for themselves, and for the public. While emergency medical service people may not play the primary role in ensuring public safety in an ongoing emergency in which the situation is fluid and somewhat confused, emergency responders play a role in ensuring the safety of all those involved.

¶ 85. The statements and actions of the declarant and interrogator in this encounter are also substantially similar to the statements evaluated by the Supreme Court in *Bryant.* Coleman asked, "Who did this?" and "What happened?" The answers were "Marvin," "Big Headed Marvin," and that he was arguing with some woman, was lured outside, and that's when he was shot.

¶ 86. Coleman's questions were similar to the initial inquires in *Bryant,* and under an objective evaluation of the "primary purpose" of the statements made by the victim, similarly result in a conclusion that they are non-testimonial statements.

¶ 87. I conclude that the admission of Coleman's testimony in the present case did not violate the Sixth Amendment Confrontation Clause; the victim's statements were non-testimonial and fall within the hearsay exception.

¶ 88. I turn now to the testimony of police officer Wayne Young. Officer Young testified that he and his partner responded to the scene of the shooting. When

they arrived, Officer Young's primary responsibility was to get observers out of the street, clearing the area around the emergency. At the scene Officer Young did not approach the victim while he was lying on the ground.

¶ 89.   Officer Young was instructed to ride along with the victim to the hospital with the emergency medical unit. Officer Young accompanied the victim into the hospital emergency department.

¶ 90.   Officer Young testified that while he was standing by in the emergency department, a doctor notified him that if he had any questions for the victim he should ask them now because the doctor's opinion was that the victim was not going to survive the gunshot injuries.

¶ 91.   Officer Young testified that he spoke with the victim, asking him if he had "any information about who may have shot him." Officer Young testified that the victim responded "Marvin" and gave a brief description of "dark complected, bald headed guy with a big forehead."

¶ 92.   Officer Young testified that the victim then lost consciousness and was taken to surgery, where he ultimately succumbed to the gunshot injuries.

¶ 93.   The statements and actions of Officer Young and the victim did not go beyond the initial inquiry of who may have shot the victim.

¶ 94.   The informalities of the situation suggest that the primary purpose of the interrogator was not focused on possible future prosecutorial use of the statements. The questions and answers were given in a harried, informal way. There was no structure to the questions asked. Officer Young asked an open-ended initial inquiry question and the statements in response

50

gave little detail or information. These informalities suggest a purpose of meeting the ongoing emergency, that is, a shooter at large, potentially not satisfied that the victim was not yet dead, and potentially a danger to the public or hospital staff. The informalities of the encounter suggest the primary purpose was not prosecutorial.

¶ 95. An emergency response to a potentially mortal shooting is a fluid environment of competing priorities. Objectively, prosecution of the killer may also have been an ancillary factor to Officer Young's questioning. The encounter between the victim and Officer Young occurred at the hospital and not at the scene of the shooting, after significant time had lapsed. Officer Young asked questions knowing that the victim was likely to die. An objective analysis might lead one to conclude that the primary purpose of the questions and answers in the hospital just prior to the victim's undergoing surgery was not to meet an "ongoing emergency" and instead was testimonial, focused on prosecution.

¶ 96. The distinctions between the circumstances surrounding the encounter between Officer Young and the victim in this case and the encounter analyzed in *Bryant* are that Officer Young's encounter with the victim did not occur upon arrival at the scene of an ongoing emergency, but rather after significant time had passed, and that the encounter occurred within a hospital emergency department removed from the crime scene.

¶ 97. In *Bryant,* the Supreme Court did not have to determine when the "ongoing emergency" ended; statements made within the first few minutes of the arrival of emergency services, near the location of the shooting, and well before the scene of the shooting was secure fell

well within the bounds of an "ongoing emergency."[25] In the present case, statements made to Coleman, the EMT, upon his arrival at the scene of the shooting similarly fall within the bounds of an "ongoing emergency." Statements made to Officer Young are more difficult to categorize.

¶ 98. I refrain, however, from determining whether the victim's statements to Officer Young were testimonial or non-testimonial, a closer call. And I refrain from determining whether testimonial dying declarations are a historical exception to the guarantee of the Confrontation Clause. These determinations are not necessary to decide the present case. Officer Young's testimony was repetitive of Coleman's testimony. Even if the victim's statements to Officer Young were testimonial hearsay and even if the dying declaration exception is not recognized, the admission of Young's testimony was harmless error.

¶ 99. For these reasons, I do not join the majority in creating an exception to the Sixth Amendment guarantee of confrontation, an exception not yet recognized by the United States Supreme Court, and I concur.

[25] *Bryant,* 131 S. Ct. at 1165.